*Chambers, October 26th, 1836.*

IN THE MATTER OF JOSHUA TOULMIN, MITCHELL, OTHERWISE CALLED EDWARD COPPEE, MITCHELL.

## Habeas Corpus.

On a *habeas corpus* at *common law*, the Court, (or Judge presiding) on the return, has the power to change the custody of an infant child, if its interests require it.

And this discretion is more properly to be exercised, when the infant is too young to make a proper election.

The writ of *habeas corpus* at common law, applies as well to cases of illegal *detention* as illegal confinement or restraint.

The father has the legal right to the custody of his children.

But Courts of justice may control this right, when the safety or interests of the child imperiously require it.

### By ROBERT M. CHARLTON, Judge.

IN delivering my opinion orally in this application, I intimated that I would reduce the substance of it to writing, in order that it might be spread upon the minutes and preface the order that I granted, relative to the custody of the child, the subject matter of the *habeas corpus*. In questions of general importance to the community at large, most particularly in matters that affect the nearest and dearest rights, the opinions of those who adjudicate, in the last resort, upon those rights, and the grounds of those opinions, should be known, or at least should be open to the inspection of all, whose interests may be affected by them.

The *habeas corpus* in this case, was issued at the instance of Dr. *John J. Mitchell*, and directed to Dr. *Edward Coppee*, requiring him to bring up the body of *Joshua Toulmin, Mitchell*, alias *Edward Coppee, Mitchell*, the son of Dr. *Mitchell*, the applicant, and the grandson of Dr. *Coppee*. It appears that the child is only

PART II.—K. 3.

three months old, and that its mother (the wife of applicant, and daughter of Dr. *Coppee*,) died in childbed, at the house of her father and mother, where the child was born, and has remained ever since, with the consent of its father, until a few days ago, when becoming dissatisfied, as he alleges, with the treatment it was receiving, and anxious to obtain it, that it might be under his own charge, he demanded it, and the grand parents refused to deliver it up. Sundry affidavits are exhibited on the part of the grandfather, going to shew the kind and judicious manner in which it has been treated, and expressing an opinion that a change of nurses, residence, and treatment, might be attended with danger to the infant. The fact is also stated in these affidavits, that the father of this child promised his wife, the daughter of respondent, (on her death bed, and in answer to her request,) that it should remain with her parents during its infancy, and that the applicant has since admitted that he made such a promise On the other hand, he denies under oath ever having done so, and without asserting that there is any want of kind treatment to the child on the part of the grand parents, he yet declares, that their treatment of it is in his opinion injudicious, calculated to make its constitution too delicate, and to pre-dispose it to a disease hereditary in the family of its deceased mother. The morals of the father are not impeached, nor is his pecuniary ability to maintain the child denied. The return admits the custody, but denies that the infant is under any illegal restraint.

It is contended on behalf of the grandfather, that this is not a case in which the writ of *habeas corpus* will apply; that there is here no *illegal restraint*, and that all a Court will do on such applications, will be, to relieve the infant from improper restraint, but that it will not determine in this summary manner, any rights of guardianship *inter partes*, when these are contested. The cases cited by the counsel do declare this doctrine. But neither these cases, nor any other that I am apprised of, (except perhaps, *Rex*

vs. *Smith*, 2 Strange 982,) deny that the Court, or Judge presiding, on the return of the *habeas corpus*, has the discretion vested in it, to place the custody of the child into the hands of any one, by whom its interests and health would be best promoted. The cases assert, that the Court is not bound to deliver the infant over to any particular person; that it is not a matter of *right* which the father can claim at the hands of the Court, but a matter resting in the sound discretion of the Court, to be guided by the interests of the child. (*Rex* vs. *Delaval, et. al.* 3 Bur. 1436. *Commonwealth* vs. *Adicks* and *wife*, 5 Binney 520. Matter of *Waldron*, 13 John 420. *United States* vs. *Green*, 3 Mason 482.) And it is most proper that this discretion should be exercised by the Court, when the infant is too young to make a proper selection. It was accordingly exercised in the case of the *King* vs. *Johnson*. (1 Strange 579. L. Raym. 1334.) And though the authority of this case has been impugned, (*King* vs. *Smith*, 2 Str. 982,) yet Lord *Mansfield*, in the case of the *King* vs. *Delaval, et. al.* (1 Blackstone's Rep. 412,) remarks, in reference to this case, "It is said in the next case, that Lord *Raymond* repented of what was done in this. His Lordship was latterly a very scrupulous man. But we are clear his *first* judgment was the right one." And in a case which occurred in this Circuit and County, one of my predecessors, (my father, Judge *Thomas U. P. Charlton*,) on an application like this, took the infant from her grandmother, and gave to her legal guardian the custody of her person, upon the ground, that the child who was only seven years old, was unable to make a free and unbiassed election between her grandmother and guardian, and adding "that upon different circumstances, this Court, upon the authority adduced, would permit the infant to go where sh  pleased." (Matter of *Ralston*.*) The precedent established by these authorities, negatives both positions of the counsel for the grandfather, for these cases shew, that the writ of *habeas corpus* at common

* *Supra*, 119.—(*Ed.*)

law, will apply, though there be, strictly speaking, no illegal restraint and confinement of the infant, and that the Court will determine under this application, and under circumstances similar to the present, the right of custody. To confine the writ of *habeas corpus* at common law, exclusively to cases of illegal *confinement*, would be destructive of the ends of justice. It would enable a kidnapper to maintain possession of a child of tender years, (taken by him by fraud or force from the bosom of its family,) merely because its want of legal discretion would preclude the idea of its being confined against its will. I apprehend that it is not going too far to say, that the interests and welfare of society require, that under peculiar circumstances, the fact that the child of tender years is *detained* improperly from the custody of the person entitled to its possession, is sufficient to ground and maintain the writ of *habeas corpus*.

And the power to determine the right of custody on applications of this nature, ought more properly to be exercised by this tribunal, (unless those peculiar circumstances intervene which would justify it in refusing to interfere in determining the rights of the parties,) because there is no other tribunal *in this State*, in which the question can so appropriately be decided. The peculiar jurisdiction over infants which is claimed by the Chancellor in England, as representing the King, the *parens patriæ*, and the doctrine of wards in Chancery, is not claimed or recognized by the Courts of Chancery in this State, to any extent that will bear a comparison with the claim and doctrine as established in England. Our Courts of Ordinary are clothed with the power of appointing guardians, and that power is exercised in the cases of orphans. (*Prince* 157, 168,) illegitimate children, (*Foster* 114,) and in cases where property has descended to a child whose father or mother is in life, and such natural guardian refuses to give bond and security for the performance of the trust. (*Foster* 110.) Without at all intending to decide the question, I may observe, that under

these statutes of Georgia, our Courts of Ordinary have never pretended to claim the right to appoint a guardian to a legitimate child, whose father was in life, and capable in all respects to maintain it, unless property had descended to the child, and the father refused to give security for the performance of the trust. If then this Court, the highest judicial tribunal in the State, has the power to determine the right of custody of an infant of tender years, and there is no other Court where such right can be so appropriately decided, the power ought to be exercised in favor of the party having the legal right, unless the circumstances of the case and the precedents established, would justify it, acting for the welfare of the child, in refusing its aid.

It becomes important then to enquire, who has the legal right to the custody of this infant, and it seems to me, that the answer that would rise to the lips of any one, however unskilled he might be in the science of the law, would be, that such right resides in the father. The law of nature, the feelings which God has implanted both in the man and the brute, alike demand, that he who is nearest to it, who is the author of its being—who is bound to its maintenance and protection, and answerable to God for the manner in which it is reared, should have its custody, and the law of man which is founded upon reason, is not hostile to the assertion of this claim. Lord *Ellenborough*, in the case of the *King* vs. *De Manneville*, (5 East. 223,) speaking of the father, says, " he is the person entitled by law to the custody of his child. If he abuse that right, the Court will protect the child." *Lawrence*, J. concurred, and added, that " Lord *Kenyon* had no doubt but that the father was entitled to have the custody of the infant, unless the Court saw reason to believe, that the father intended to abuse his right by sacrificing the child." In both these cases the child was given to the father, (and in the latter the custody of the mother was divested for that purpose,) although in *De Manneville's* case, the father was an alien, the mother a subject, and the infant

only eight months old, and at the breast of its mother; and in the other case mentioned by *Lawrence*, J. as having been determined by Lord *Kenyon*, Sir *W. Murray* had been divorced from the mother, and though the child was born before the divorce, there was not any reason to think the child his. But the Court did not think that a sufficient ground to deny him the custody of it, he being the *legal* father. And in *Lytton's* case, mentioned in *De Manneville's* case, it is stated, that Lord *Mansfield* said, that the Court could not at any age take a child from its father. Lord *Eldon*, when this case came before him as Chancellor, (10 Vesey Jr, 61,) speaks of the right of the father to have the custody of his child as " the legal, natural right of the father." Chancellor *Kent*, (2 vol. Com. 192, 3d edit.) says, that the right of the father is *perfect* while the child is under the age of fourteen years. And indeed Mr. *Chitty* affirms, that the Court of King's Bench cannot directly control this right, (Notes to 1 Bl. Com. 360—see also *ex parte Skinner*, 9 Moore's Rep. 278.) And Lord Chancellor *Eldon*, (in *Lyons* vs. *Blenkin*, 1 Jacob 245,) seems to draw a distinction where the Chancellor is acting on a *habeas corpus*, and when there is a cause *in Court*, and to hold that in the former case, he is bound to decide on the same principles as a common law judge, and could only then divest the legal right of the father to the custody, by proof of personal ill usage, or other circumstances shewing that he was an improper person to have charge of his child. When there is a cause in Court, his powers are more ample. But it is unnecessary to multiply authorities on a *point* that cannot be contested.

But notwithstanding this legal right of the father, circumstances may exist which would justify a Court in this proceeding, in refusing to lend its aid to him in procuring the custody of his child, or even withdrawing the infant from his custody, when its morals, its safety, or its interests seem to require it. All legal rights, even those of personal security and liberty may be forfeited by

[In the matter of Mitchell]

improper conduct, and so this legal right of the father to the possession of his child, must be made subservient to the true interests or safety of the child, and to the duty of the State to protect its citizens of whatever age. A host of authorities might be adduced to maintain this position, and I do not doubt its justice or correctness for a moment. (See 2 Kent's Com. 3d edit. 193, 205. 4 John. Ch. Rep. 80. 5 Binney's Rep. 520. 3 Mason's Rep. 482, and various other American and English authorities cited in note (c) 2d Kent's Com. 193, note (b) ibid. 205.)

But do these circumstances exist in this case? Is the father brought within the range of those authorities? He is not alleged to be of bad morals, of unsound mind, or of pecuniary inability to maintain his child. He is an intelligent physician, who disagrees to the mode in which his child is treated in a medical point of view, and expresses under oath his apprehension, that both the body and mind of his offspring will suffer under such treatment. He is anxious to obtain its custody, that he may guard it against the consequences of this treatment, and that he may shield it from a disease, which he alleges to be hereditary in the maternal line, and which the manner in which it is reared, is fast driving it into. He is competent to determine whether its removal at the present time would endanger its safety, and a Court (which will draw no inference to the disadvantage of the father, but will act from positive proof,) will presume, that his natural feelings will prevent his sacrificing his child by such removal, if it be improper, and that he will not immolate it on the altar of his resentment to its other relatives. To a father thus able to maintain and preserve his infant, unimpeached in morals, and asking from this tribunal, that his legal, natural right should be awarded to him, shall a denial be given?

But it is urged that this legal right has been abandoned by the father, and that the affidavits accompanying the return, disclose the fact, that he promised his wife on her death bed, that the child should remain with its maternal relatives during infancy. This

promise is distinctly denied by the father under oath. The counsel for the grandfarther objects to any weight being given to such denial, as it is a contradiction to the return to the *habeas corpus*, which may not be controverted. Without intending to decide the disputed point whether the facts set forth in the return to a *habeas corpus* at common law, may be controverted by proof of their falsity, made apparent by contrariant affidavits, I may observe, that it is not every fact, however irrelevant, which an individual may choose to incorporate in his return, that is to conclude the Court. But assuming that this fact cannot be controverted or denied, I presume that no one contests my right to determine if it is sufficient in law to justify the restraint or detention. This is a promise then, made to the *wife* of the applicant, on her death bed, and at her instance, under circumstances, when perhaps no request, however unreasonable, would have been denied. This case differs very widely from *Listor's* case, (13 East 172, note,) where the husband had abandoned his marital rights by formal articles of separation, and the Court therefore refused to give him the custody of the wife. And it also differs from the case of *Rex* vs. *Delaval*, where the parent had by indenture parted with his parental authority. (1 *Black.* Rep. 413.) In the case before me, the promise was made to the *wife* of the applicant without any legal consideration, and I cannot hold it to be an entire surrender of his l gal or parental right. It might with great propriety be called *nudum pactum*.

From all these considerations, I feel it to be my duty to deliver the custody of this child to its father. I do so with the expression of a hope, that he will not deny to its maternal relatives, their natural (though not their legal) right to have access to it, at proper times and under proper circumstances.

*It is ordered*, that the infant *Joshua Toulmin, Mitchell*, otherwise called *Edward Coppee, Mitchell*, be delivered to the custody of its father, Dr. *John J. Mitchell*.

M. Sheftall, Senr., for father—L. S. D'Lyon, contra.